Filed 10/26/22
See Dissenting Opinion

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHAD DEFRIES, | |
| Plaintiff and Appellant, | E073917 |
| v. | (Super.Ct.No. RIC1710904) |
| YAMAHA MOTOR CORPORATION, U.S.A., | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Kira L. Klatchko, Judge.

Affirmed in part and reversed in part.

Morris Law Firm, James A. Morris, and Barbara M. Sharp for Plaintiff and

Appellant.

Snell & Wilmer, Todd E. Lundell, Daniel S. Rodman, and Jing (Jenny) Hua, for

Defendant and Respondent.

Plaintiff and appellant Chad Defries suffered injuries while riding a Yamaha dirt

bike.  He sued the U.S. distributor of that dirt bike, defendant and respondent Yamaha

Motor Corporation, U.S.A. (Yamaha), among others, asserting  that the accident was

---

<sup>*</sup>  Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is
certified for publication with the exception of part II.  B.  through II.  D.

1

caused by a throttle assembly that fell off the handlebar as he was riding. The jury found in Yamaha's favor, and the trial court later awarded Yamaha costs.

On appeal, Defries contends, among other things, that the court erroneously denied his request to instruct the jury that Yamaha was liable for its dealer's negligent assembly of the dirt bike, a ruling that limited Defries's negligence cause of action to Yamaha's own negligence. California law, however, places "responsibility for defects, whether negligently or nonnegligently caused, on the manufacturer of the completed product . . . regardless of what part of the manufacturing process the manufacturer chooses to delegate to third parties." (*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 261 (*Vandermark*).) The same principle applies to distributors. And as the distributor of a completed product, Yamaha "cannot delegate its duty . . . [and thus] cannot escape liability on the ground that the defect in [Defries's bike] may have been caused by something one of its authorized dealers did or failed to do." (*Ibid.*) Thus, Defries was "relieved of proving that the manufacturer or distributor was negligent in the production, design, or dissemination of the [product]." (*Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 736-737.) Rather, if the dealer negligently assembled the product, Yamaha was jointly liable for damages caused by that negligence. Because the requested instruction should have been given, we reverse the judgment on the negligence cause of action. We otherwise affirm the judgment.

## I. BACKGROUND

Defries's wife purchased a dirt bike in December 2016 as a Christmas present for her husband. Defries first rode the bike a month later.

On February 12, 2017, Defries rode the dirt bike again. He met with his friends Johnny Butcher and Johnny Kitchin at a dirt course in Perris.

Defries rode for about 15 or 20 minutes and was going through the whoops, or small hills, portion of the course. As he testified at trial: "I was coming through [the whoops] kind of in a crouched position, sitting up over the bike. As I'm going the bike is rocking back and forth. And then at one moment the throttle just kind of slipped off and the handlebars came into me and I went down. It was quick. It just happened like that."

Butcher testified at trial that "[j]ust shortly after [Defries] entered the whoops, maybe the second or third one in, his handlebars went to the left and then he just tumbled." Both Butcher and Kitchin observed that the throttle was hanging off to the side and not attached to the bike when they loaded the bike back onto Defries's truck after the accident.

Defries fractured his right femur and separated his shoulder. He possibly suffered a hernia from the accident as well.

Defries filed suit against four defendants: Yamaha, Yamaha Motor Company Limited (Yamaha Japan), Yamaha Motor Manufacturing Corporation of America, and West Coast Yamaha, Inc., doing business as Langston Motorsports (Langston Motorsports). The complaint alleged five causes of action against all defendants:

negligence, strict product liability (manufacturing defect), strict product liability (design defect), strict product liability (failure to warn), and breach of implied warranty.

Yamaha Japan and Yamaha Motor Manufacturing Corporation of America were dismissed early, leaving only Yamaha and Langston Motorsports as defendants. Defries settled with Langston Motorsports before opening statements began at trial. During trial, Defries withdrew his causes of action for strict products liability (manufacturing defect) and strict products liability (design defect). Thus, the jury was tasked with determining only whether Yamaha was liable for three causes of action: negligence, strict products liability (failure to warn), and breach of implied warranty.

Within the complaint's negligence cause of action, Defries alleged that Yamaha (and the other defendants) had a duty to assemble the motorcycle so that the throttle assembly did not disengage from the handlebar, and that they negligently assembled it. Prior to trial, Defries opposed summary judgment by arguing, as its first reason why Yamaha was negligent and citing *Vandermark*, that Yamaha was liable for the dealer's negligence in failing to properly secure the throttle because it had a nondelegable duty to properly assemble his motorcycle.

Defries's trial theory was that the crash was caused by the failure of one or both of the bolts in the throttle assembly to be properly tightened, and that Yamaha was liable even though it did not assemble the throttle. In opening statements, Defries's counsel told the jury that Yamaha has "what we call a nondelegatory duty" to make sure the

4

motorcycle is safe, but they chose to delegate that responsibility to the dealer and "the throttle bolts were not properly secured at the dealership."

A Yamaha employee testified that its dirt bikes are designed by Yamaha Japan and that Yamaha distributes those dirt bikes in the United States. Yamaha buys the dirt bikes from Yamaha Japan but does not assemble them; rather, it passes along partially assembled dirt bikes from Yamaha Japan in crates to dealers, who then complete final assembly of the dirt bikes before selling them to consumers. The dealer's assembly includes putting the throttle assembly onto the handlebar and assembling the handlebar onto the dirt bike. Langston Motorsports was the dealer who assembled and sold Defries's dirt bike.

One of Defries's experts, Russell Darnell, opined that Langston Motorsports did not properly torque the bolts on the throttle assembly—that "[m]ost likely" the Langston Motorsports employee in charge of assembling the dirt bike "tightened one too tight and the second one not to spec." Darnell stated that when a bolt is not properly tightened, vibrations from vehicle operation can cause it to fall out. He stated: "[P]ractically everybody has got a weed eater or an old car or something where a bolt falls out. That's from vibration. A bolt never tightens itself. It will always continue to the outside to where it gets to the point where it falls out. That's just normal vibration. In this case the bolts were not torqued to enough torque to stop that." Darnell stated that bolt release could occur either if "[t]he bolts were not tightened enough" or if the one of the bolts were over-torqued. Darnell opined that had the bolt been properly tightened, Defries

5

would not have crashed the dirt bike. Separately, Darnell stated that the throttle cable on Defries's dirt bike (which was shown at trial) had been routed to the handlebar incorrectly. Another of Defries's expert witnesses, Christopher Brignola, also testified that one of the assembly bolts attaching the throttle to the handlebar had been overtightened.

Yamaha disputed that the throttle bolts had been improperly tightened. As one of its experts stated: "When the bolts are loose, the throttle can rotate on the handlebar. In order to give it gas, it has to be—if you twist it—the effect is that you can't give it consistent amounts of throttle. It slips on the handlebar. It affects your ability to control that. You're not able to start it up." Another one of its experts conceded that the throttle cable had been routed incorrectly. Yamaha contended that a throttle cable leashes the assembly to the handlebar and that the amount of force that would have been necessary to fully remove the assembly would have stretched and damaged the cable, adding that there was no such damage to the throttle cable on Defries's dirt bike. Yamaha's theory was that Butcher and Kitchin deliberately removed the throttle from the handlebar after the crash in order to "help" Defries. In response, Defries' expert witness Brignola opined that there was "no evidence consistent with tampering of the bolts or disassembling of the throttle."

The jury returned special verdicts for Yamaha on all three causes of action, and the trial court entered judgment for Yamaha. The trial court later denied Defries's new

6

trial motion and awarded Yamaha costs.  Defries appealed from the denial of the motion for new trial and the motion to strike or tax costs that led to Yamaha's costs award.

## II.  DISCUSSION

Defries correctly contends that the jury should have been instructed that any negligence in assembly by Langston Motorsports should be imputed to Yamaha because of a nondelegable duty Yamaha had, and that judgment on this claim must therefore be reversed.

A.  *Instructional Error*

After the evidentiary phase of the trial had concluded but before closing arguments, in a hearing outside the presence of the jury, the trial court heard arguments over disputed jury instructions.

Defries first requested, and the trial court refused, several instructions relating to the existence or nonexistence of an agency relationship between Yamaha and Langston Motorsports.  The trial court believed that no evidence justified giving the instructions, at one point stating:  "I have heard no evidence that they are your agent for general negligence."

Defries then requested that the jury hear CACI 3713, an instruction on nondelegable duty.[1]  Defries argued that "it's a matter of law that the manufacturer,

---

[1]  CACI 3713 reads as follows:

"[*Name of defendant*] has a duty that cannot be delegated to another person arising from [*insert name, popular name, or number of regulation, statute, or ordinance*/a

7

distributor of a product has a nondelegable duty to provide a safe product to the consumer." After the trial court noted that Defries had withdrawn some of his strict liability causes of action, Defries replied that Yamaha has "a nondelegable duty to make sure the product is consumer safe and that includes assembly. We have argued negligence [in] assembly in this case. That's in fact one of our causes of action. The responsibility exists in that context as well."

The trial court concluded: "I don't think this instruction is appropriate. I think it would be highly misleading and lead the jury to wrongly conclude that as a matter of law if they find negligence, that Yamaha is responsible. I don't think we want to misdirect them."

Later, during closing arguments, Yamaha told the jury: "Let's first talk about the negligence claim. There you see the first question, was Yamaha . . . negligent. That's

contract between the parties/*other, e.g., the landlord-tenant relationship*]. Under this duty, [*insert requirements of regulation, statute, or ordinance or otherwise describe duty*].

"[*Name of plaintiff*] claims that [*he/she/nonbinary pronoun*] was harmed by the conduct of [*name of independent contractor*] and that [*name of defendant*] is responsible for this harm. To establish this claim, [*name of plaintiff*] must prove all of the following:

"1. That [*name of defendant*] hired [*name of independent contractor*] to [*describe job involving nondelegable duty, e.g., repair the roof*];

"2. That [*name of independent contractor*] [*specify wrongful conduct in breach of duty, e.g., did not comply with this law*];

"3. That [*name of plaintiff*] was harmed; and

"4. That [*name of independent contractor*]'s conduct was a substantial factor in causing [*name of plaintiff*]'s harm."

8

where you have to see if they were negligent. You're not deciding . . . Langston [Motorsports] or [the employee who assembled the dirt bike]. Your question you have to answer is was Yamaha negligent here. Yamaha should have given this warning to double-check the tightness of the bolts."

Yamaha continued: "When deciding the issue of negligence it's not looking at, did the dealership screw something up and do something wrong here. It's, did Yamaha do something wrong in the instructions or warnings that they gave to the dealership."

"An order denying a motion for new trial is nonappealable. [Citation.] Such an order, however, may be reviewed on appeal from the underlying judgment." (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.)

"[A] trial judge is accorded a wide discretion in ruling on a motion for new trial," and "the exercise of this discretion is given great deference on appeal." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872.) "We will not disturb the trial court's determination of a motion for a new trial unless the court has abused its discretion." (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.) However, when the court has denied a motion for new trial, "we must determine whether the court abused its discretion by examining the entire record and making an independent assessment of whether there were grounds for granting the motion." (*Ibid.*)

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct

9

in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).)  We first discuss whether the instruction should have been given and then consider whether any error in refusing to do so was prejudicial.

*1.  Nondelegable Duty Instruction*

Defries's proposed instruction on nondelegable duties was proper.  Contrary to what the trial court stated, if Langston Motorsports had negligently assembled Defries's dirt bike, then Yamaha would be liable as a matter of law.  Although the legal authority for this proposition has been overshadowed by other legal concepts for reasons we explain below, it is nevertheless applicable, binding precedent.

In *Dow v. Holly Mfg. Co.* (1958) 49 Cal.2d 720 (*Dow*), a father and two children were found dead in their home from asphyxiation due to carbon monoxide poisoning. (*Id.* at p. 722.)  The surviving family members (the mother and one of the children) sued the general contractor who built the home.  (*Ibid.*)  Although the general contractor planned and built the home, he had a subcontractor install the faulty heater that caused the deaths.  (*Ibid.*)  The subcontractor was not a party to the action.  (*Ibid.*)

Trial evidence showed, among other things, that "the orifices which admitted the gas [into the heater] for burning were too large" and that "as a result of the larger orifices sooting would occur, which, over a period of time, would result in carbon monoxide entering the house from the heater." (*Dow*, *supra*, 49 Cal.2d at p. 723.)  The jury found in plaintiffs' favor.  (*Id.* at p. 722.)

10

Our Supreme Court in *Dow* addressed "whether the general contractor was liable for the negligent installation of a defective gas heater by . . . his subcontractor." (*Dow*, *supra*, 49 Cal.2d at p. 725.) It held that he was. (*Id.* at pp. 722, 728.) Noting that "there is no valid distinction between a general contractor constructing a building and using subcontractors to install equipment therein, and the manufacturer of an automobile buying parts not fabricated by it to install in the car," and that "[t]here should be liability in both cases," *Dow* concluded that "[i]t was [the general contractor]'s responsibility to construct a house equipped with an adequate heating system[,] and he could not negate that responsibility by delegating to [the subcontractor] the work of installing the necessary equipment for said heating system." (*Id.* at pp. 727-728.)

In another case six years later, our Supreme Court cited *Dow* for the proposition that "the manufacturer of a completed product [is] subject to vicarious liability for the negligence of his suppliers or subcontractors that resulted in defects in the completed product." (*Vandermark*, *supra*, 61 Cal.2d at p. 261.)

*Vandermark* involved a scenario analogous to Defries's. "In October 1958 plaintiff Chester Vandermark bought a new Ford automobile from . . . an authorized Ford dealer doing business as Maywood Bell Ford. About six weeks later, while driving on the San Bernardino Freeway, he lost control of the car. It went off the highway to the right and collided with a light post. He and his sister, plaintiff Mary Tresham, suffered serious injuries. They brought [an] action for damages against Maywood Bell Ford and the Ford Motor Company, which manufactured and assembled the car. They pleaded

11

causes of action for breach of warranty and negligence. The trial court granted Ford's motion for a nonsuit on all causes of action." (*Vandermark*, *supra*, 61 Cal.3d at p. 258.) One of the questions before our Supreme Court in *Vandermark* was whether the nonsuit was proper. (*Id.* at pp. 259-260.)

The *Vandermark* plaintiffs "called an expert on the operation of hydraulic automobile brakes. In answer to hypothetical questions based on evidence in the record and his own knowledge of the braking system of the car, the expert testified as to the cause of the accident. It was his opinion that the brakes applied themselves owing to a failure of the piston in the master cylinder to retract far enough . . . . The expert also testified that the failure of the piston to retract sufficiently . . . could have been caused by dirt in the master cylinder, a defective or wrong-sized part, distortion of the firewall, or improper assembly or adjustment." (*Vandermark*, *supra*, 61 Cal.2d at pp. 259-260.) In response, Ford noted that "the car passed through two other authorized Ford dealers before it was sold to Maywood Bell and that Maywood Bell removed the power steering unit before selling the car to Vandermark." (*Id.* at p. 260.)

The Court noted an additional fact: "It appears in the present case that Ford delegates the final steps in [the manufacturing] process to its authorized dealers. It does not deliver cars to its dealers that are ready to be driven away by the ultimate purchasers but relies on its dealers to make the final inspections, corrections, and adjustments necessary to make the cars ready for use." (*Vandermark*, *supra*, 61 Cal.2d at p. 261.) (The Court, however, did not make clear whether the alleged defects in the braking

12

system would have come from Maywood Bell or one of the other authorized dealers who had the car.)

Relying on *Dow* and other cases as well as the evidence before it, *Vandermark* held that the trial court erred in granting a nonsuit against Ford on plaintiffs' negligence cause of action. (*Vandermark*, *supra*, 61 Cal.2d at p. 261.) The Court noted that *Dow* and other cases "focus responsibility for defects, whether negligently or nonnegligently caused, on the manufacturer of the completed product, and they apply regardless of what part of the manufacturing process the manufacturer chooses to delegate to third parties. . . . Since Ford, as the manufacturer of the completed product, cannot delegate its duty to have its cars delivered to the ultimate purchaser free from dangerous defects, it cannot escape liability on the ground that the defect in Vandermark's car may have been caused by something one of its authorized dealers did or failed to do." (*Ibid.*)

*Vandermark* involved the direct manufacturer (Ford), but the Court there made it clear that the same concepts applied to downstream entities as well. In noting that negligent or nonnegligent defects are the manufacturer's responsibility, *Vandermark* cited section 400 from the Restatement of Torts, which states that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." (*Vandermark*, *supra*, 61 Cal.2d at p. 261, citing Rest. Torts, § 400.) *Dow* also relied on the same Restatement section for its holding. (See *Dow*, *supra*, 49 Cal.2d at pp. 726-727.)

13

Under *Dow* and *Vandermark*, Defries was entitled to an instruction that Yamaha had a nondelegable duty to deliver a dirt bike to Defries free from dangerous defects, regardless of whether those defects were caused by Langston Motorsports, one of Yamaha's dealers in the final assembly. Just as it is a general contractor's responsibility to "construct a house equipped with an adequate heating system"—a responsibility that cannot be delegated to a subcontractor (*Dow*, *supra*, 49 Cal.2d at p. 728)—it was Yamaha's nondelegable responsibility to deliver Defries a dirt bike free from dangerous defects. That analogy is made more direct by *Vandermark*'s statement that the nondelegable duty of a product manufacturer (here, a distributor) to deliver to the consumer a defect-free product means it cannot "escape liability on the ground that the defect . . . may have been caused by something one of its authorized dealers did or failed to do." (*Vandermark*, *supra*, 61 Cal.2d at p. 261; accord, *Caporale v. Raleigh Industries of America, Inc.* (Fla. Dist. Ct. App. 1980) 382 So.2d 849, 851 ["The manufacturer cannot . . . disclaim liability for injuries to the ultimate purchaser of a product where the manufacturer knowingly relies on its dealer to put the product in a finished state."] (*Caporale*), citing *Vandermark*; *Sabloff v. Yamaha Motor Co.* (N.J. Super. Ct. App. Div. 1971) 113 N.J.Super. 279, 290, affd. (N.J. 1971) 59 N.J. 365 ["where [the manufacturer] did not deliver its motorcycles to its dealer ready to be driven away by the ultimate purchasers but relied on the dealer to put into assembly the non-assembled parts and make the motorcycles ready for use, [the dealer] could not escape liability for a defect in

14

the motorcycle on the ground that it may have been caused by something that its authorized dealer . . . did or failed to do"], citing *Vandermark*].)**2**

In finding otherwise, the trial court may have erred in two aspects of its reasoning. The first error was an unwarranted emphasis on the fact that Defries withdrew his claim for strict liability (manufacturing defect) during trial. The trial court noted when deciding on the proposed jury instruction, for instance, that Defries had withdrawn some of his strict liability claims. The idea of manufacturer liability for a product defect is typically associated with the concept of strict liability in modern legal thinking. *Vandermark*, which we have relied upon above for its discussion of negligence, is usually cited as part of a line of seminal cases on *strict liability*. (See, e.g., *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 477-478 [noting that, a year after "California became the first state to allow recovery for strict products liability," *Vandermark* "extended strict products

---

**2** The pioneering principle underlying *Vandermark* is the "early step in the development of the law of products liability . . . the recognition of a manufacturer's liability in negligence to an ultimate consumer without privity of contract." (*Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 15 [citing *MacPherson v. Buick Motor Co.* (1916) 217 N.Y. 382, 389].) Judge Posner has observed: "The law of products liability has come to recognize what economists and businessmen have long known—that manufacturers are in a direct economic relationship with the ultimate consumers of their products even if they are not in privity with them." (*Jack Walters & Sons Corp. v. Morton Bldg., Inc.* (7th Cir. 1984) 737 F.2d 698, 707.) Reflecting the manufacturer's duty to the consumer, the Court of Appeal has relied on *Vandermark* to hold that, by making its dealers responsible for a vehicle recall, a car manufacturer "could not shift to the dealer the direct obligation of safety it owed the customer" when a car's defect was not remedied. (*Ford Motor Co. v. Robert J. Poeschl, Inc.* (1971) 21 Cal.App.3d 694, 699; see also *Springmeyer v. Ford Motor Co.* (1998) 60 Cal.App.4th 1541, 1562-1563 ["A manufacturer cannot delegate responsibility for the safety of its product to dealers, much less purchasers"].)

liability to retailers"], italics removed; *Loomis v. Amazon.com LLC* (2021) 63 Cal.App.5th 466, 475-476 [describing similar history].)

However, Defries's withdrawal of his claim of strict liability based on a manufacturing defect did not preclude him from seeking recovery from Yamaha based on Langston Motorsports's alleged negligence. It merely obligated Defries to prove that the defect was Langston Motorsports's fault (i.e., based on its negligence), something it would not have to prove in a strict liability action. (See *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 479 ["[U]nder either a negligence or a strict liability theory of products liability . . . a plaintiff must prove that a defect caused injury. [Citations.] Under a negligence theory, a plaintiff must also prove 'an additional element, namely, that the defect in the product was due to negligence of the defendant'"]; Rest.3d Torts, Products Liability, § 2 ["Negligence rests on a showing of fault leading to product defect. Strict liability rests merely on a showing of product defect"].) Given the prevalence of product defect cases focusing on strict liability theories, it might seem natural to assume that such cases can proceed *only* on such theories. But doing so would contravene *Vandermark's* holding that a manufacturer is responsible for defects "whether negligently or nonnegligently caused" in any part of the manufacturing process, including "the final steps in that process" delegated to authorized dealers. (*Vandermark*, *supra*, 61 Cal.2d at p. 261.) Doing so would also confuse theories of liability with the primary right afforded to Defries under California law, which is the right to receive a product without dangerous defects. (See *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1182 ["'causes of

16

action'" for negligence, strict liability, breach of implied warranty, and wrongful death actually comprised "one true 'cause of action'"; "the four 'causes of action' were actually counts based on the same primary right of plaintiffs and the same primary duty of defendants, each of which merely alleged additional circumstances out of which the primary right and primary duty arose"]; *Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1487 ["the cause of action is based on the harm suffered, not the particular theory which the litigant asserts"].)  Put in more direct terms, for purposes of analyzing Yamaha's duty to deliver a defect-free product, Defries's negligence claim is the same as strict liability, just in the form of liability for Langston Motorsports' negligent assembly.[3]

The second error may have been the trial court's belief that Defries failed to prove that Langston Motorsports was an agent of Yamaha.  Cases have often framed issues surrounding vicarious liability and nondelegable duties in terms of agency.  (See, e.g., *Maloney v. Rath* (1968) 69 Cal.2d 442, 446 ["[u]nlike strict liability, a nondelegable duty operates, not as a substitute for liability based on negligence, but to assure that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm and who may therefore properly be held liable for the negligence of his agent, whether his agent was an employee or an independent contractor"], cited in CACI 3713.)  And for the sake of argument, we will assume that the

_____

[3] The trial court's later ruling on Defries's new trial motion appears to have recognized this, as the court noted in a discussion of prejudice that "the jury was clearly presented with the correct theory of liability, and was asked to find Yamaha negligent based on [Langston Motorsports]'s conduct."

17

trial court was making an accurate statement when it observed that it heard "no evidence" that Langston Motorsports was Yamaha's agent. However, the nondelegable duties developed in vicarious liability doctrine are based on public policy decisions that do not depend on an independent showing of the elements of agency. Rather, the duties serve goals such as placing responsibility on the entities "in the best position to ensure product safety," where those in the production chain can "adjust the costs of liability" in their "continuing business relationship." (*Jimenez*, *supra*, 29 Cal.4th at p. 479; see *Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 727 ["the nondelegable duty rule advances the same purposes as other forms of vicarious liability"].)

*Vandermark* requires the conclusion that an "authorized dealer" acts as the manufacturer's agent by allowing liability when the dealer "make[s] the final inspections, corrections, and adjustments necessary to make the [vehicles] ready for use." (*Vandermark*, *supra*, 61 Cal.2d at p. 261.) Consequently, Langston Motorsports' agency for purposes of delivering a properly assembled dirt bike to the customer was established as a matter of law once Defries showed that Langston Motorsports was Yamaha's authorized dealer and assembled the dirt bike. In contrast, *Vandermark* would not necessarily create liability for a manufacturer that sold a product to an entity *other than* an authorized dealer charged with assembling the product for sale to a customer, even where that entity negligently altered the product for a person's use. This situation might often occur in a context other than a consumer's retail purchase of a manufacturer's product. (See *In re Deep Vein Thrombosis* (N.D. Cal. 2005) 356 F. Supp. 2d 1055, 1063

18

[distinguishing *Vandermark* in lawsuit by passengers for airlines' negligent installation of defective seats, where the manufacturer, Boeing, sold airplanes to airlines that were not its authorized agents charged with completing Boeing's manufacturing process, and the installation of the seats was not pursuant to Boeing's direction or specifications] [applying California law]; *Alvarez v. Felker Manufacturing Co.* (1964) 230 Cal.App.2d 987, 993, 1001 [in suit brought by a worker injured by negligently installed blade while operating employer's machinery, affirming trial court's finding of no agency where evidence showed that manufacturer of defective blade and employer were "seller and buyer" rather than principal and agent].)[4] Consistent with *Vandermark*, cases outside of California have found manufacturer liability for dealer negligent acts where the dealer was charged with assembling a motorcycle or bicycle before sale. (*Sabloff v. Yamaha Motor Co.*, *supra*, 113 N.J.Super. at p. 290; *Caporale*, *supra*, 382 So.2d at p. 851 ["The manufacturer's argument that the authorized dealer is an independent contractor and that, therefore, the manufacturer is not responsible for the dealer's action, is not persuasive. The manufacturer instructed the dealer in the assembly of the bicycle and implicitly made the dealers' service its own"].)

---

[4] See also *Hull v. Eaton Corp.* (D.C. Cir. 1987) 825 F.2d 448, 458 [in lawsuit brought by employee operating forklift, affirming district court's finding of no agency where manufacturer "assembled the forklift prior to delivery" to a commercial dealer, which altered it and sold it to employer, which operated a warehouse]; *Leon v. Caterpillar Indus., Inc.* (7th Cir. 1995) 69 F.3d 1326, 1336 [in another lawsuit brought by forklift-operating employee, affirming finding of no agency where forklift manufacturer sold it "in a work ready condition" to a commercial dealer, which altered it and sold it to the employer company], footnote omitted.

19

All of the cases discussed here, as well as our holding today, are in accord with a rule stated in the Restatement (Third) of Torts:  Products Liability (1998):  "When the manufacturer delegates some aspect of manufacture, such as final assembly or inspection, to a subsequent seller, the manufacturer may be subject to liability under rules of vicarious liability for a defect that was introduced into the product after it left the hands of the manufacturer."  (§ 2, comment c.)  This rule has the laudable effect of encouraging a manufacturer or distributor like Yamaha to act to safeguard proper assembly by its various dealers, including attempting to ensure that negligent conduct in one location does not repeat elsewhere.  It further ensures that a plaintiff does not have the burden of discovering and proving *which* entity in the production chain is responsible for negligent assembly:  Yamaha for insufficient instructions or safeguards that would ensure proper assembly, or a dealer for failing to execute Yamaha's commands properly.[5]

_____

[5]  The dissent suggests that if we are correct that *Vandermark* held that a manufacturer could be liable for its dealer's negligent assembly of its product, the decision "would have been a bombshell."  (Dis. opn., *post*, at p. 10.)  That is in fact how the leading torts scholar of the day, William L. Prosser, viewed *Vandermark*, calling it "the most extreme decision of all those applying strict liability to date."  (William L. Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)* (1966) Minn. L. Rev. 791, 827-828.)  As we do, Prosser recognized that *Vandermark* "held that the obligation of the manufacturer to supply the ultimate purchaser with an automobile safe for his use was such that it could not be delegated to the dealer, and that it could not escape liability for an unsafe product on the ground that the defect . . . might have been caused by something the dealer 'did or failed to do' in servicing the car before final delivery."  (*Id.* at p. 828.)  Prosser suggested that manufacturer liability for dealer negligence under *Vandermark* be limited "only to the delegation of 'servicing,' or other work completing the product."  (Prosser, at p. 828)  He stated that "it can scarcely be supposed that the manufacturer would be liable, where, for example, a bottle of beer is cracked by the dealer while it was being handled."  (*Ibid.*)  Prosser's suggestion that under *Vandermark*

20

In contending that the instruction was properly denied, Yamaha argues that Defries waived his claim of instructional error by failing to proffer a version of CACI 3713 with the bracketed portions filled in. Although a court "may refuse to give a requested instruction when the blank spaces are not filled in" (*Timmons v. Assembly of God Church* (1974) 40 Cal.App.3d 31, 38), the court expressed no concern with this at the time the court rejected CACI 3713. The court accepted or took under submission other disputed instructions that Defries submitted with bracketed portions without suggesting that the brackets were an inherent flaw at that time. In contrast, when the court considered Defries's requested instruction on present cash value, the court specifically noted its concern that Defries had not chosen which one of two bracketed options the form provided.

More importantly, however, the only bracketed portions of CACI 3713 that might have been difficult to fill in would have been the portions explaining where the

---

a manufacturer's liability for dealer negligence lies only for work, such as product assembly, that it has delegated to the dealer—without liability for dealer negligence untethered to any such delegation—presaged the view ultimately adopted by the Restatement (Third) of Torts three decades later (§ 2, comment c) that we join today. As to that type of manufacturer liability, Prosser recognized in 1966 that *Vandermark* "at least eliminates any intervening negligence, whether of act or of omission, in preparing the product for final sale." (Prosser, *The Fall of the Citadel (Strict Liability to the Consumer), supra*, at p. 828; see also, e.g., *Vaughn v. Chrysler Corp.* (10th Cir. 1971) 442 F.2d 619, 620-622 [holding car manufacturer liable for the negligence of a dealer and citing *Vandermark* for the proposition that the "fact that the subject truck was not defective in original manufacture is no defense"]; David W. Leebron, *An Introduction to Products Liability: Origins, Issues, and Trends* (1990) Ann.Surv.Amer.L. 395, 424, fn.150 [citing *Vandermark* for the proposition that "courts early on rejected attempts by automobile manufacturers to avoid strict liability by delegating final tasks, such as inspection of the brakes, to dealers"].)

21

nondelegable duty arises from, and the court had asked Defries where he thought that duty came from.  The first paragraph of the form instruction states:  "[*Name of defendant*] has a duty that cannot be delegated to another person arising from [*insert name, popular name, or number of regulation, statute, or ordinance*/a contract between the parties/*other, e.g., the landlord-tenant relationship*].  Under this duty, [*insert requirements of regulation, statute, or ordinance or otherwise describe duty*]."  When discussing this instruction, the court asked Defries for his "basis for saying it's not delegable," to which his counsel stated, "[b]ecause under the law it's a matter of law that the manufacturer, distributor of a product has a nondelegable duty to provide a safe product to the consumer."  The fact that the court later noted, in its ruling denying Defries's new trial motion, that "the proposed instruction could have been rejected merely because it was incomplete," does not preclude Defries from raising the instructional argument here, and we decline to find that he has waived it.

Accordingly, the trial court erred in refusing to give Defries's proposed jury instruction on nondelegable duties.

*2.  Prejudice*

In reviewing a judgment where the appellant has raised the denial of a new trial motion as an issue, "an appellate court has the obligation to review 'the entire record, including the evidence, so as to make an independent determination whether the error was prejudicial.'"  (*Hasson v. Ford Motor Co.*, *supra*, 32 Cal.3d at 417, fn. 10.)

"[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission." (*Soule*, *supra*, 8 Cal.4th at p. 580.) Rather, "[i]nstructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.'" (*Ibid.*) In other words, "[i]n cases of instructional error, a reasonable probability that 'the jury would have returned a more favorable verdict' is sufficient to establish prejudice." (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 132.)

In determining whether "an error of instructional omission" was prejudicial, the reviewing court evaluates "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, *supra*, 8 Cal.4th at pp. 580-581, fn. omitted.) In reviewing claims of instructional error, we "view[] the evidence in the light most favorable to the appellant." (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.) "[W]e must assume that the jury might have believed the evidence upon which the instruction favorable to the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party." (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674.)

We find that the error in denying Defries's jury instruction was prejudicial here.

First, there was substantial evidence that Langston Motorsports negligently assembled Defries's dirt bike. This included expert witness testimony that one or both of

23

the bolts in the throttle assembly had been improperly tightened (and that this improper tightening can cause the throttle to come off the handlebar), as well as uncontroverted testimony that another part of the throttle assembly—the throttle cable—had been incorrectly routed. Given the concession that at least one part of the assembly had been faulty, and Defries's experts' view that the improper bolts in the throttle assembly is what led to the crash, it would have been reasonable for a jury to conclude that Langston Motorsports was negligent had it been allowed to make such a finding. Although there was also expert testimony (namely Yamaha's) to the effect that the throttle bolts had been torqued correctly, we must view the evidence in the light most favorable to Defries and assume that the jury might have believed the evidence he presented. (See *Henderson v. Harnischfeger Corp.*, *supra*, 12 Cal.3d at p. 674; *Orichian v. BMW of North America, LLC*, *supra*, 226 Cal.App.4th at p. 1333.)

In contesting this point, Yamaha points to the trial court's ruling on the motion for new trial, specifically the trial court's statement that "there was virtually no evidence upon which the jury could have based a conclusion that [Langston Motorsports] negligently installed the throttle assembly." Because we must independently determine whether the denial of a new trial was prejudicial (*Hasson v. Ford Motor Co.*, *supra*, 32 Cal.3d at p. 417, fn. 10), however, we accord no deference to the trial court's contrary conclusion here, as it was not one on a witness's credibility. (See *People v. Vivar* (2021) 11 Cal.5th 510, 524 [independent review standard "accords substantial weight to the trial

court's credibility findings"].) As we have stated, there was substantial evidence tending to prove Langston Motorsports's negligence.

Second, the "effect of other instructions" (*Soule*, *supra*, 8 Cal.4th at p. 581) left the jury no way of knowing, other than by guessing, that any negligence on Langston Motorsports's part was properly imputed to Yamaha as a matter of law. Nothing in the other instructions given to the jury or the special verdict form informed the jury that Langston Motorsports's negligence meant Yamaha's negligence. Although Yamaha notes that the jury was instructed that Yamaha "cannot avoid responsibility just because some other person, condition or event was also a substantial factor in causing" Defries's harm, this instruction relates to situations where multiple *causes* lead to an injury, not the relevant circumstance of *one* cause being attributed by law to multiple *people*.

Third, nothing Defries's counsel could have argued could have ameliorated the effect of the missing instruction, as a crucial link in the chain of reasoning had not been provided to the jury. (See *Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 274 ["""[W]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the [attorney's] comments as words spoken by an advocate in an attempt to persuade"""].) This is not an instance, for example, where counsel's arguments made error less prejudicial because they helped focus the jury's attention on how the broad— yet sufficient—instructions given could be applied to the facts of the case. (E.g., *Soule*, *supra*, 8 Cal.4th at p. 582 [finding no prejudice in part because counsel's "argument

25

uniformly supported the reasonable inference that the general causation instruction allowed"].)[6]

On the fourth *Soule* factor—whether there are "any indications by the jury itself that it was misled" (*Soule*, *supra*, 8 Cal.4th at p. 581, fn. omitted)—Defries does not contend that any such indications exist. However, in light of the state of the evidence, the effect of other instructions, and the effect of counsel's arguments, we find a reasonable probability that the jury would have returned a verdict in Defries's favor on negligence had it been given proper instructions. We therefore find that the trial court abused its discretion in denying Defries's motion for new trial.[7]

B. *Motions in Limine*

"Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion. [Citations.] 'The trial court's error

---

[6] In any event, to the extent we would consider counsel's arguments as statements of law to the jury, Yamaha's closing argument would likely have added to Defries's prejudice. In its closing argument, Yamaha told the jury that it was *not* to decide whether Langston Motorsports was negligent, but rather to decide whether Yamaha was because of a failure to advise double-checking on the bolts. Counsel stated: "You're not deciding whether Langston [Motorsports] or [the employee who assembled the dirt bike]. Your question you have to answer is was Yamaha negligent here. Yamaha should have given this warning to double-check the tightness of the bolts." Moments later, Yamaha repeated the point: "When deciding the issue of negligence it's not looking at, did the dealership screw something up and do something wrong here. It's, did Yamaha do something wrong in the instructions or warnings that they gave to the dealership." A jury heeding Yamaha's statements would have avoided deciding the very issue that Defries was entitled to ask the jury to decide: whether Yamaha could be found negligent because of Langston Motorsports's actions.

[7] In the unpublished portion of this opinion, we reject Defries's other claims of error.

26

in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a "miscarriage of justice"—that is, that a different result would have been probable if the error had not occurred.'" (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

Defries contends that the trial court erred in granting (in whole or in part) four of Yamaha's motions in limine. As we explain, we find no error.

*1. Motion in Limine: Prior Incidents*

Yamaha's motion in limine sought to exclude all evidence relating to two other incidents involving the same model of dirt bike as Defries's. The evidence of both other incidents was internal Yamaha customer relations reports.

In one incident (the 2011 incident), a Yamaha customer relations report stated that a customer in North Carolina "'bought the bike & his son . . . had an accident on the 1st ride. [The customer] says the throttle came off the handlebars & the bike took off up into the woods.'" Although Yamaha requested that the customer take the dirt bike to a local dealership for inspection, the customer never did so, and no additional information was ever provided.

In discussing the 2011 incident, Yamaha contended that the document describing the incident was excludable as "pure hearsay because it's just someone calling in and they are just writing down verbatim what the person says over the phone. [¶] This is similar to a police report where a police officer takes a statement from a witness at a scene, summarizes the statement, includes it in their police report, and then someone then

27

wants to read that statement into evidence and use it against a defendant in trial. You can't do that. That's hearsay. You would have to go and take the deposition of that witness so that everyone has an opportunity to examine them about this and test the reliability of the statement."

The trial court granted the motion in limine. It concluded that the document describing the 2011 incident was a business record but that any probative value would be outweighed by undue prejudice. (See Evid. Code, § 352.) The trial court stated: "A limiting instruction would have to be crafted . . . . If I had to craft some kind of limiting instruction, it would essentially be, jury, you can't use this for any purpose other than a call was made from some unknown person, said this. You wouldn't be able to say anything else beyond that."

The trial court was well within its discretion to exclude the evidence under Evidence Code section 352. As the trial court correctly suggested, the jury would not have properly been able to use the documents as evidence that either the 2011 or 2014 incidents occurred, so any probative value it may have had was substantially outweighed by the danger of undue prejudice, confusing the issues, or misleading the jury. (See Evid. Code, § 352.)

The document describing the 2011 incident would not have been properly admitted to prove the existence of the 2011 incident because the document contained two levels of hearsay, and at least one of the levels of hearsay did not fall within an exception to the hearsay rule.

28

""'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' (Evid. Code, § 1200, subd. (a).) Unless otherwise provided by law, hearsay evidence is inadmissible. (Evid. Code, § 1200, subd. (b).)" (*Daniels v. Department of Motor Vehicles* (1983) 33 Cal.3d 532, 537 (*Daniels*).) One exception is Evidence Code section 1271, the business record exception. "That statute makes admissible evidence of a writing made as a record of an event when (a) the writing was made in the regular course of business; (b) the writing was made at or near the time of the act, condition or event, (c) the custodian or other qualified witness testifies to its identity and the mode of its preparation; and (d) the source of information and method and time of preparation were such as to indicate its trustworthiness." (*Daniels*, *supra*, 33 Cal.3d at p. 537.)

"Double hearsay is not categorically inadmissible; instead, a double hearsay statement is admissible if each level of hearsay comes within an exception to the hearsay rule." (*Caliber Paving Company, Inc. v. Rexford Industrial Realty and Management, Inc.* (2020) 54 Cal.App.5th 175, 189.)

We can assume for the sake of argument that the first level of hearsay—the Yamaha employee's hearsay—fell under the business records exception. That is, we can assume that the document was made in the regular course of Yamaha's business, was made at or near the time of the customer's report, that the Yamaha employee or some other qualified witness could testify to the document's identity and mode of preparation,

and the source of information and method and time of preparation were such as to indicate its trustworthiness.  (See Evid. Code, § 1271.)

We cannot assume, however, that the second level of hearsay—the customer's hearsay—also fell under the business records exception, as Defries contends.  There was nothing in the source of its information to indicate any level of trustworthiness.  Although neither party has cited the case, *Daniels* is directly on point here.  In *Daniels*, our Supreme Court considered whether a report made by a crash accident victim to the Department of Motor Vehicles (DMV) qualified as a business record.  (*Daniels*, *supra*, 33 Cal.3d at pp. 534-535.)  The Court held that it was not.  (*Id.* at pp. 537-538.)  It stated that "[a]lthough it may be the regular course of business for the [DMV] to receive the report, it undoubtedly is not in the regular course of business for the citizen author to make such a report.  And, it is this aspect of the report that bears on the trustworthiness factor contemplated by this exception to the hearsay rule."  (*Ibid.*)

*Daniels*'s rationale applies to the customer's hearsay.  Even though creating and documenting incident reports might be in Yamaha's regular course of business (which pertains to the first level of hearsay), customers making such reports (which pertains to the second level) are not in Yamaha's regular course of business.  As Yamaha correctly noted when arguing the motion in limine, this is analogous to the admission of the contents of a police report without any means of testing the declarant's reliability.

In sum, the trial court properly excluded the document describing the 2011 incident.

In the other incident (the 2014 incident), the customer relations report stated that a customer "'purchased the unit Friday 10/31/2014. Went to the track 11/2/2014 & had an accident. [Customer] claims it had nothing to do with him. He says he went over a jump and upon landing the throttle broke completely off. [Customer] says the tube broke off the throttle housing and was hanging off of the bike.'" An inspection revealed that the throttle tube had broken due to an impact with the ground during the crash, which was not the same as the throttle assembly falling off of the handlebar.

Defries essentially conceded that the 2014 incident was excludable because it was not substantially similar. His counsel stated: "I will concede that the one from 2014 may lack substantial similarity because what happened there, the guy went out to the jump and the throttle tube broke causing the throttle to come off the handlebar." In arguing the motion, the parties hardly mentioned the 2014 incident.

In any event, the document describing the 2014 incident was also properly excluded. Not only would this document also fail to be admissible double hearsay for the same reason the document describing the 2011 incident fails, but the record also supports Defries's concession the 2014 incident was not substantially similar. (See *Ault v. International Harvester Co.* (1974) 13 Cal.3d 113, 121-122 ["Evidence of other accidents is admissible to prove a defective condition, knowledge, or the cause of an accident, provided that the circumstances of the other accidents are similar and not too remote"].) We find no error.

31

## 2. *Motion in Limine: Darnell's Throttle Cable Test*

Another motion in limine sought to exclude evidence from Defries's expert Russell Darnell. Yamaha believed that Defries would introduce evidence of an experiment Darnell performed, in which he put the throttle assembly from Defries's dirt bike back on, and use that experiment as a basis for his opinion that the accident was caused by the throttle assembly falling off the handlebar. The experiment was apparently meant to show that the throttle cable was long enough to have come off of the handlebar undamaged, thus disproving Yamaha's contention that the throttle cable would have prevented the assembly from falling off the handlebar.

In conjunction with argument on the motion, Darnell testified outside the jury's presence. Defries's dirt bike was in the courtroom, so Darnell demonstrated to the trial court what he did in the experiment. The trial court ruled that it would allow Darnell to "testify to his general expert opinion about the crash" but granted the motion to exclude the experiment itself.

"In the field of products liability, the problem of admitting experimental evidence is a very real one; attorneys on both sides must rely upon expert testimony and accident reconstruction experimentation; that is particularly true where causation is a major issue." (*Culpepper v. Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 (*Culpepper*).)

"Admissibility of experimental evidence depends upon proof of the following foundational items: (1) The experiment must be relevant [citations]; (2) the experiment must have been conducted under substantially similar conditions as those of the actual

32

occurrence [citation]; and (3) the evidence of the experiment will not consume undue time, confuse the issues or mislead the jury." (*Culpepper*, *supra*, 33 Cal.App.3d at p. 521.) "The proponent of the evidence need not show that conditions at the time of the experiment were identical to the conditions at the time in dispute; substantial similarity is all that is required." (*Staples v. Hoefke* (1987) 189 Cal.App.3d 1397, 1416.)

The trial court ruled that Darnell's experiment was performed under circumstances "clearly different" from the accident. We find no abuse of discretion. First, it was uncontroverted that: (1) the throttle assembly had been assembled at the time of the accident, but it had been partially disassembled prior to the experiment and not reassembled, and that the difference would have accounted for "probably half an inch" of slack; (2) the brake reservoir on the right handlebar had been rotated about 90 degrees as a result of the crash and had not been adjusted back; and (3) Defries was riding straight at the time of the accident, but the only photographs Darnell had taken of his experiment showed that the handlebars had been turned to the left, and turning the handlebars left shortens the distance necessary for the throttle assembly to attach or detach from the handlebar. Darnell believed that these differences were insignificant, but he also effectively conceded that his opinion on the significance of the differences was not based on empirical data, but rather his own expertise.

Second, and more importantly, the trial court's finding that the circumstances of Darnell's test were "clearly different" from that of the crash was based in part on the trial court's observation of what the experiment entailed, based on Darnell recreating it while

testifying for the motion. It was thus in a position to see for itself whether any differences would have been significant in a relevant way.

In contending that the ruling was an abuse of discretion, Defries states in passing that the trial court also erred in prohibiting Darnell's experiment "on a new exemplar dirt bike, which he had disclosed during his deposition he would perform at trial." The only portion of the record he cites to in support of this claim, however, is Darnell's testimony during the motion in limine. Darnell's claim during court testimony that he had disclosed the test during a deposition is not the same as a citation to the portion of his deposition where he made the disclosure, assuming such a disclosure exists. And without deposition testimony from Darnell that he sought to perform the experiment on an exemplar dirt bike at trial, he would have been prohibited from doing so. (See *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780 (*Easterby*).) We accordingly treat this claim as forfeited for failure to properly cite the record. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239.)

We conclude that the trial court's ruling as to Darnell's experiment was not an abuse of discretion.

*3. Motion in Limine: Darnell's Designation as an Expert on Warnings*

In another motion in limine, Yamaha sought to exclude any testimony or opinions from Darnell regarding warnings, contending that he lacked proper qualification as an expert on that topic. As with his experimental evidence, Darnell testified outside the presence of the jury about this matter. Following Darnell's testimony, the trial court,

addressing Darnell, stated: "I think you're undeniably [qualified] to talk about safety and what the best practices [for dirt bike assembly] would be. But I have heard nothing that leads me to believe that you are qualified to say what the language of the manual should be in terms of, you know, this box should be in all bold, and should have an exclamation, and say recheck it. [¶] . . . [Y]ou could easily talk about, you know, the best practice would be, after you torque that bolt down, before it leaves the shop, to double check it every single time to make sure no one has walked off with it. I think you can testify to that. But I don't think you are qualified, as a witness, to talk about how the manual was designed or what the manual should say." The trial court continued: "So that motion is – I guess I would say granted in part. To the extent he's opining on general safety issues and this motion encompassed that, or that consumers would not be expected to check the bolts, he can opine on that as well. He just can't opine on the specific warnings here in these manuals."

Evidence Code section 720, subdivision (a), allows a witness to testify as an expert "'if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' . . . [A]n expert's qualifications 'must be related to the particular subject upon which he is giving expert testimony. Qualifications on related subject matter are insufficient.'" (*People v. Chavez* (1985) 39 Cal.3d 823, 828.) "We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion." (*Ibid.*)

The trial court's ruling was well within its discretion.  Darnell's responses to questions from Yamaha and the trial court showed that he was not qualified to opine on warnings.  During Yamaha's cross-examination Darnell conceded that he had never appeared as an expert on the design or wording of warnings; did not identify warnings, human factors, or ergonomics as fields of expertise on his resumé and lacked a degree or certification in those subjects; and never designed warnings for consumer motor vehicles.  The trial court confirmed that Darnell had not designed any motorcycle warnings like those at issue in this case.

Given this testimony, the trial court correctly concluded that Darnell was not qualified as an expert on the topic of warnings.  The proposition that Defries relies on in support of a contrary conclusion, that "the degree of [an expert's] knowledge is a matter which affects the weight of his testimony, not its admissibility" (*People v. Stuller* (1970) 10 Cal.App.3d 582, 597), only comes into play once it is determined that the witness is qualified as an expert in the area at issue.  Darnell was not.  We find no error in the trial court's ruling.

### 4.  Motion in Limine:  Brignola's Post-Deposition Opinions

In the last motion in limine Defries challenges on appeal, Yamaha sought to exclude a report from Defries's other expert witness, Christopher Brignola, produced 22 days before trial in May 2019.  According to the motion, during Brignola's deposition in December 2018, he confirmed that he had stated all opinions he intended to formulate for

36

the case and that Defries had asked him to do no additional work. Brignola did not produce any report before or at his deposition.

The later report contained six opinions. Opinion #1 stated: "More likely than not, the subject throttle was not on the handlebar at some point during the crash." Opinion #4 stated: "I disagree with [Yamaha's expert Erin Higinbotham's] opinion stating that Dr. Darnell's assertion of a vibrational weakness or over vibration concept as related to the subject motorcycle's throttle assembly has no scientific basis." Opinion #6 stated: "I disagree with [Langston Motorsports's expert Steven Anderson's] identification of the throttle cable as the kill switch wire."

Following argument, the trial court granted the motion in limine as to opinion #1 and opinion #6. It stated that opinion #1 and opinion #6 were "truly not at all covered in the deposition" and that it would not be possible for Brignola to be redeposed given the trial date. As to opinion #4, the trial court granted the motion as to the case in chief only, meaning that opinion #4 could be used only for rebuttal purposes. The trial court denied the motion as to the other three opinions, stating that they were "clarifications of existing positions, not brand new issues."

Although on appeal Defries challenges the trial court's ruling on the motion in limine broadly, opinion #6, which related to an opinion by one of Langston Motorsports's experts who never testified at trial, is not relevant. Indeed, Defries's opening brief does not even specifically identify opinion #6.

With regard to opinion #1 (whether the throttle came off the handlebar during the crash) and opinion #4 (rebutting Yamaha's expert's opinion on vibrational weakness), we find no abuse of discretion. "[A] party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony *if* the opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably difficult." (*Easterby*, *supra*, 171 Cal.App.4th at p. 780.) Given that Brignola's report, which acted as notice of new testimony, was disclosed just three weeks before trial, it was well within the trial court's discretion to find that deposing Brignola again would have been unreasonably difficult.

Defries does not contend that opinions #1 and #4 were covered in Brignola's deposition, so we consider only whether the report was produced too late. In contending that it was not, Defries characterizes this case as similar to *Easterby*, where the Court of Appeal found the exclusion of expert testimony to be prejudicial error. (*Easterby*, *supra*, 171 Cal.App.4th at p. 783.) The time period involved in *Easterby*, however, was three months, not three weeks, so the "defendants in [that] case had the opportunity to take [the expert]'s deposition in light of his changed opinion and prepare for cross-examination and rebuttal of his testimony." (*Id.* at p. 780.) The facts of *Easterby* therefore do not help Defries.

Defries also contends that the ruling was in error because, according to him, Brignola had initially been identified as an expert who would opine on causation, something both opinion #1 and opinion #4 cover. However, as Yamaha notes, during his

38

deposition, Brignola indicated that Darnell would be the sole expert witness on causation. In that same deposition Brignola also acknowledged that he had stated all of the opinions he intended to formulate for the case. Under these circumstances, whether Brignola had at one point been designated as an expert on causation is irrelevant, as Yamaha was entitled to rely on Brignola's disclaimer unless it had a reasonable opportunity to depose him again on his causation opinions before trial. (See *Easterby*, *supra*, 171 Cal.App.4th at p. 780.)

Finally, Defries emphasizes that the timing of Brignola's report in May 2019 was "logical[]," given that three of Yamaha's experts were deposed in January and March 2019, after Brignola's December 2018 deposition. Brignola needed additional time, Defries contends, to form opinions in response to Yamaha's experts. However, there is no reason to believe—and Defries offers none—that opinion #1 was a rebuttal opinion, and the trial court allowed Brignola to offer opinion #4 in rebuttal. Thus, in substance, the trial court allowed Brignola to offer opinions in response to Yamaha's experts. Defries does not demonstrate an abuse of discretion on this basis.

Accordingly, we find no error in the court's rulings on the motions in limine.[8]

---

[8] Our conclusions here do not necessarily preclude Brignola from testifying as to causation in a new trial on remand. Given our reversal of the judgment as to the negligence cause of action, discovery will reopen, and the "last date for completing discovery is 15 days before the date initially set for the new trial of the action." (*Fairmont Ins. Co. v. Superior Court* (2000) 22 Cal.4th 245, 247.)

39

C. *Breach of Implied Warranty*

Defries contends that the jury verdict in Yamaha's favor on the breach of implied warranty count must be overturned because there was no evidence supporting Yamaha's affirmative defense that the warranty had been disclaimed.

Although styled as a challenge to the sufficiency of the evidence, Defries's argument here is actually an attack on the special verdict form. Because Defries did not object to the special verdict form before the court discharged the jury, the claim was forfeited.

"Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law. [Citation.] It does not 'impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality.'" (*American Suzuki Motor Corp. v. Superior Court* (1995) 37 Cal.App.4th 1291, 1295-1296.) The implied warranty of merchantability can be disclaimed. (Cal. U. Com. Code, § 2316, subd. (2).)

Defries's contention focuses on question 12 of the special verdict form, which read: "Did the sale of the 2017 Yamaha YZ250 motorcycle include notice that would have made a buyer aware that it was being sold without any representation relating to the quality that a buyer would expect?" The jury answered the question in the affirmative,

thus finding that Yamaha had shown an affirmative defense to the breach of implied warranty claim.[9]

The wording of question 12 accords with California Uniform Commercial Code section 2316, subdivision (3)(a), which states that "[u]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." In addition, the parties had agreed on the wording of question 12 as well as all of the other questions on the special verdict form.

There is no indication in the record, nor does Defries attempt to show, that he believed question 12 was deficient after he had acquiesced to its wording and before the jury was discharged. On appeal, however, Defries contends that "absolutely no evidence was presented at trial that written 'notice' was *attached* to the dirt bike stating it was being sold 'as is' or 'with all faults'; that the buyer was accepting the *entire* risk of

---

[9] The jury also found inapplicable the implied warranty of fitness for a particular purpose. "An implied warranty of fitness for a particular purpose arises only where (1) the purchaser at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time of contracting has reason to know of this particular purpose, (3) the buyer relies on the seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the time of contracting has reason to know that the buyer is relying on such skill and judgment." (*Keith v. Buchanan* (1985) 173 Cal.App.3d 13, 25.) The jury answered no to the question, "[a]t the time of the purchase, did Yamaha . . . know or have reason to know that Plaintiff Chad Defries intended to use the 2017 Yamaha YZ250 motorcycle for a particular purpose?"

quality and performance; and that if the dirt bike was defective, the *buyer* would be responsible for the cost of all servicing and repair" (italics added).

The characteristics Defries cites do not come from California Uniform Commercial Code section 2316. Rather, they come from Civil Code section 1792.4, which is part of the Song-Beverly Consumer Warranty Act.[10]

Defries first claimed that the special verdict form needed to have included these elements from the Song-Beverly Consumer Warranty Act in his *reply* brief to his motion for new trial.

A party forfeits "any objection to the special verdict form by failing to object before the court discharge[s] the jury." (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131.) Here, the objection was not made before the jury was discharged. Accordingly, the objection was forfeited.

In any event, even if the issue had not been forfeited, we note that Defries's claim that insufficient evidence supported the breach of implied warranty count would have failed on the merits. "[W]here a party to a civil lawsuit claims a jury verdict is not

_____

[10] Civil Code section 1792.4, subdivision (a) provides: "No sale of goods, governed by the provisions of this chapter, on an 'as is' or 'with all faults' basis, shall be effective to disclaim the implied warranty of merchantability or, where applicable, the implied warranty of fitness, unless a conspicuous writing is attached to the goods which clearly informs the buyer, prior to the sale, in simple and concise language of each of the following:  [¶]  (1) The goods are being sold on an 'as is' or 'with all faults' basis.  [¶] (2)  The entire risk as to the quality and performance of the goods is with the buyer.  [¶] (3)  Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair."

supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against *the instructions given the jury*." (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1258, 1535, italics added. Assuming that Defries had not in fact challenged the jury instructions on this count, he would have failed to show that the evidence was insufficient in the way he now contends on appeal. This is because the errors he now claims—such that a written notice needed to have been attached to the dirt bike, that the buyer was accepting the entire risk of quality and performance, and that the buyer would be responsible for all service and repair costs on a defective dirt bike—were not part of the instructions given to the jury at all; at least, Defries has not shown they were, given that the record does not contain the actual instructions themselves. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 ["'Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant]'"].)

D. *Section 998 Offer*

Defries's final contention is that the trial court's costs award to Yamaha was in error because its earlier section 998 offer, made in October 2018, was invalid. Because we reverse the judgment as to the negligence cause of action, this issue is not yet ripe for review.

The ripeness requirement "prevents courts from issuing purely advisory opinions." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170.) "'A controversy is "ripe" when it has reached, but has not passed, the point that the facts have

43

sufficiently congealed to permit an intelligent and useful decision to be made.'" (*Id.* at p. 171.) As the matter now stands, any decision regarding the propriety of the section 998 offer would have to assume both that there will be a new trial on the negligence cause of action and that Defries will not recover more than the amount stated in Yamaha's section 998 offer. (See Code of Civ. Proc, § 998, subd. (c)(1) ["If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her post offer costs and shall pay the defendant's costs from the time of the offer"].) Neither of these assumptions would necessarily be true. Accordingly, we decline to rule on the issue now.

## III.  DISPOSITION

The judgment is reversed as to the cause of action for negligence and the award of costs.  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION

RAPHAEL_____

J.

I concur:

McKINSTER_____

Acting P. J.

44

[*Defries v. Yamaha Motor Corporation, U.S.A.*, E073917]

MENETREZ, J., Concurring and Dissenting.

The majority opinion holds that it can be a tort to sell a nondefective product. According to the majority opinion, if a distributor sells a partially unassembled product to a dealer and the dealer negligently assembles it, thereby rendering it dangerous, then the distributor is vicariously liable for the dealer's negligence even if the product was in no way defective when it left the distributor's hands—it was not defectively designed or manufactured, there was nothing wrong with selling it partially unassembled, there was nothing wrong with the assembly instructions, and so on. The distributor did nothing but sell a nondefective product, and yet the distributor is liable in tort. That is not and never has been the law.

The majority opinion's holding is based entirely on the California Supreme Court's decision in *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256 (*Vandermark*). In the 58 years since *Vandermark* was decided, not a single published opinion of any California appellate court has interpreted it in the manner adopted by the majority opinion. That is unsurprising, because *Vandermark* has nothing to do with holding a distributor liable for a dealer's negligence. The jury in *Vandermark* found that the dealer was not negligent, and that finding was affirmed. (*Id.* at pp. 259, 263-264.) Thus, there was no dealer negligence for which another party could be held liable. The majority opinion discusses *Vandermark* for pages but never mentions that critical fact.

1

Putting aside the interpretation of *Vandermark*, the majority opinion's partial reversal of the judgment is erroneous for an independent reason. The reversal is based on the trial court's rejection of plaintiff's request to instruct the jury with CACI No. 3713, which the majority opinion describes as "an instruction on nondelegable duty." (Maj. opn., *ante*, at p. 7.) But CACI No. 3713 is an instruction concerning the liability of a principal for the negligence of an independent contractor. Because there was no principal-independent contractor relationship between the distributor and the dealer in this case, CACI No. 3713 does not apply.

There is no basis to reverse the judgment even in part. I therefore respectfully dissent.

1.  *Background*

Plaintiff Chad Defries was injured in a crash while riding a motorcycle. Defries contends that the throttle assembly came off the right handlebar while he was riding, thereby causing him to crash.

Defries's wife bought the motorcycle for him from an authorized Yamaha dealer, West Coast Yamaha, Inc., dba Langston Motorsports (Langston). Langston had purchased the motorcycle from the manufacturer's United States distributor, defendant Yamaha Motor Corporation, U.S.A. (Yamaha).

Yamaha's motorcycles (like other manufacturers' motorcycles) are partially unassembled when they are shipped to the dealer. The dealer performs the final assembly before selling the motorcycle to the consumer. As part of the final assembly of Defries's

2

motorcycle, Langston attached the throttle assembly to the handlebar.  Defries contended that Langston performed that work negligently, improperly torquing the two bolts that secure the throttle assembly to the handlebar.

Defries sued Langston, Yamaha, and other defendants on various theories.  But he dismissed the other defendants and settled with Langston before trial, leaving Yamaha as the only defendant.  The only claims that Defries pursued at trial were negligence, strict products liability for failure to warn, and breach of implied warranty.  The jury returned a verdict in favor of Yamaha on all claims.

Defries had asked the trial court to instruct the jury with CACI No. 3713.  The bench notes for CACI No. 3713 explain the instruction's applicability as follows:  "Use this instruction with regard to the liability of the hirer for the torts of an independent contractor if a nondelegable duty is imposed on the hirer by statute, regulation, ordinance, contract, or common law."  Defries sought to use the instruction to hold Yamaha (the distributor) liable for the negligence of Langston (the dealer) in assembling the motorcycle.

CACI No. 3713 contains numerous bracketed portions that must be filled in before the instruction can be used.  In particular, the instruction states that the plaintiff must prove the following:  "That [*name of defendant*] hired [*name of independent contractor*] to [*describe job involving nondelegable duty, e.g., repair the roof*]."

3

When Defries requested CACI No. 3713, he did not fill in any of the bracketed portions, and to this day he has never filled in any of them.  The trial court declined to give the instruction to the jury.

2.    *A Distributor Is Not Liable for a Dealer's Negligence*

The majority opinion holds that when a distributor sells a nondefective but partially unassembled product to a dealer and the dealer negligently assembles it, thereby rendering it dangerous, the distributor is vicariously liable for the dealer's negligence. (Maj. opn., *ante*, at p. 2.)  No such rule exists.

Negligent assembly of a product would constitute a manufacturing defect.  (See *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 429 [defining manufacturing defects]; CACI No. 1202 ["A product contains a manufacturing defect if the product differs from the manufacturer's design or specifications or from other typical units of the same product line"].)  A defendant is liable for a manufacturing defect only if the product was defective when it left the defendant's possession.  (CACI No. 1201 [to hold a defendant liable for a manufacturing defect, the plaintiff must prove "[t]hat the [*product*] contained a manufacturing defect when it left [*name of defendant*]'s possession"]; see *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 405-406 (*Hasson*).)  Consequently, a distributor who sells a nondefective but partially unassembled product to a dealer is not liable for the dealer's negligent assembly of the product.

The same conclusion would follow if, for example, the motorcycle's manufacturer purchased the motorcycle's brake system from a third party.  If the brake system was

4

nondefective but unassembled when delivered to the manufacturer, and the manufacturer negligently assembled it when incorporating it into the motorcycle, then the manufacturer of the motorcycle would be liable, but the third party producer of the brake system would not. (See *Ramos v. Brenntag Specialties, Inc.* (2016) 63 Cal.4th 500, 508 [if a component part is not defective, "'it would be unjust and inefficient to impose liability'" on the producer of the component part "'solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders the integrated product defective'"]; Rest.3d Torts, Products Liability, § 5, com. a [sellers of component parts generally are not liable "when the component itself is not defective"].) It is not a tort to sell a nondefective product.

The majority opinion derives its contrary conclusion entirely from a misinterpretation of *Vandermark*. But *Vandermark* cannot have held that a distributor is vicariously liable for a dealer's negligence, because the dealer in *Vandermark* was not negligent.

In *Vandermark*, both the driver of a Ford automobile and his passenger were injured in a crash. (*Vandermark*, *supra*, 61 Cal.2d at p. 258.) They sued the Ford Motor Company (Ford), "which manufactured and assembled the car," and the authorized dealer that had sold the car to the driver, Maywood Bell Ford (Maywood Bell). (*Ibid.*) The suit alleged causes of action for breach of warranty and negligence against both defendants. (*Ibid.*) "The trial court granted Ford's motion for a nonsuit on all causes of action and directed a verdict in favor of Maywood Bell on the warranty causes of action." (*Id.* at pp.

5

258-259.)  The jury returned a verdict in favor of Maywood Bell on the negligence claim, and the plaintiffs appealed.  (*Id.* at p. 259.)  The Supreme Court affirmed the judgment for Maywood Bell on the negligence claim, but it reversed the judgment in all other respects.  (*Id.* at p. 264.)

At trial, the plaintiffs had introduced expert testimony that the crash was caused by a problem with the brake system.  (*Vandermark*, *supra*, 61 Cal.2d at pp. 259-260.)  They also sought to introduce expert testimony concerning the possible causes of that problem, which included "a defective or wrong-sized part" and "improper assembly," but the trial court erroneously struck that testimony.  (*Id.* at p. 260.)  Thus, the admitted evidence and the erroneously excluded evidence, taken together, showed that "the master cylinder assembly had a defect that caused the accident" and "that the defect was owing to negligence in design, manufacture, assembly, or adjustment."  (*Ibid.*)  Because the plaintiffs thus had introduced or attempted to introduce substantial evidence of a defect *caused by Ford's own negligence* in designing, manufacturing, and assembling the car, the trial court erred by granting nonsuit in Ford's favor.  (*Id.* at p. 261.)

Ford sought to escape liability for its own negligence, however, on the ground that possible causes of the defect other than Ford's negligence had not been affirmatively excluded.  (*Vandermark*, *supra*, 61 Cal.2d at p. 260.)  In support of that argument, Ford "point[ed] out that in this case the car passed through two other authorized Ford dealers before it was sold to Maywood Bell and that Maywood Bell removed the power steering unit before selling the car to Vandermark."  (*Ibid.*)  Moreover, the role of such

6

intermediaries between Ford and the injured plaintiffs appeared to distinguish the case from the Supreme Court's landmark decision in *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 (*Greenman*). *Greenman* held that "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used *without inspection for defects*, proves to have a defect that causes injury to a human being." (*Id.* at p. 62, italics added.) Ford "relie[d] on its dealers to make the final inspections, corrections, and adjustments necessary to make the cars ready for use" (*Vandermark*, at p. 261), so the *Greenman* rule appeared inapplicable—Ford's cars were inspected after they left Ford's possession but before delivery to consumers.

The Supreme Court rejected the argument. Having introduced (or sought to introduce) substantial evidence that the crash was caused by Ford's negligence, the plaintiffs did not have to prove *in addition* that the crash was *not* caused by the negligence of an intermediary—Ford "cannot escape liability on the ground that the defect in Vandermark's car *may* have been caused by something one of its authorized dealers did or failed to do." (*Vandermark*, *supra*, 61 Cal.2d at p. 261, italics added.) That is, given the substantial evidence that plaintiffs' injuries were caused by Ford's negligence, the mere *possibility* that an intermediary had done something that caused the crash—which plaintiffs' evidence did not affirmatively rule out—was not sufficient to insulate Ford from liability.

The majority opinion interprets the Supreme Court's language—Ford "cannot escape liability on the ground that the defect in Vandermark's car may have been caused

by something one of its authorized dealers did or failed to do" (*Vandermark*, *supra*, 61 Cal.2d at p. 261)—as meaning that Ford is vicariously liable for its dealers' negligence. (Maj. opn., *ante*, at pp. 13-14.) But that cannot be what the Supreme Court meant, because the dealer was not negligent. (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 118 [the court's language "'in any opinion is of course to be understood in the light of the facts and the issue then before the court'"].) The jury rejected the negligence claim against Maywood Bell, and the Supreme Court affirmed that part of the judgment. (*Vandermark*, at pp. 263-264.) (There was no evidence that the other intermediaries had done anything, negligent or otherwise, that might have caused the defect.) Thus, when Ford argued that the role of the dealer showed that Ford "may not be held liable for negligence in manufacturing the car or strictly liable in tort for placing it on the market" (*id.* at p. 260), Ford was not arguing (and could not have been arguing) against being held vicariously liable for the dealer's negligence. *There was no such negligence*. Ford was arguing only that because the dealer's *possible* contribution to the causation of the accident had not been *disproved*, Ford could not be held liable for *its own negligence*. That is the argument that the Supreme Court rejected: Ford "cannot escape liability on the ground that the defect in Vandermark's car may have been caused by something one of its authorized dealers did or failed to do." (*Vandermark*, at p. 261.)

Moreover, even if it were true that the Supreme Court in *Vandermark* stated that Ford was vicariously liable for Maywood Bell's negligence, any such statement would be dicta, because the Supreme Court affirmed the finding that Maywood Bell was not

8

negligent. "An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.'" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620; see *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 734-735.) Dicta, or "'observations and statements unnecessary to the appellate court's resolution of the case'" (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158), have no "*binding* precedential effect." (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1265.)

The majority opinion also attempts to portray this case and *Vandermark* as "nondelegable duty" cases like *Dow v. Holly Mfg. Co.* (1958) 49 Cal.2d 720 (*Dow*), which held that a general contractor is vicariously liable for the negligence of a subcontractor (*id.* at p. 725). (Maj. opn., *ante*, at pp. 10-13.) Again, the majority opinion is mistaken. It is true that *Vandermark* includes a citation to *Dow* and also states that Ford "cannot delegate its duty to have its cars delivered to the ultimate purchaser free from dangerous defects." (*Vandermark*, *supra*, 61 Cal.2d at p. 261.) But *Vandermark* is a products liability case, and the nondelegable duty doctrine at issue in *Dow* is not a products liability doctrine. Rather, it is an exception to the general rule that a principal is not vicariously liable for the negligence of an independent contractor—if the principal owes a nondelegable duty to the injured party, then the principal is liable for the independent contractor's negligence. (See, e.g., *Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 250-251 (*Van Arsdale*); *Maloney v. Rath* (1968) 69 Cal.2d 442, 446-447 (*Maloney*).) There is no principal-independent contractor relationship between Yamaha

9

and Langston. *Dow* and the nondelegable duty doctrine consequently have nothing to do with this case.

Before today, no published opinion has ever cited *Vandermark* as a nondelegable duty case. Moreover, just four years after *Vandermark*, the Supreme Court decided two cases concerning nondelegable duty. Both opinions discussed the doctrine extensively, but neither opinion mentioned *Vandermark*. (*Van Arsdale*, *supra*, 68 Cal.2d at pp. 245-257; *Maloney*, *supra*, 69 Cal.2d at pp. 442-448.) *Maloney* described the "wide variety of situations" in which nondelegable duties have been recognized, citing more than a dozen cases (including *Dow*), but *Vandermark* was not among them. (*Maloney*, at p. 447.) Until now, no one has ever thought that *Vandermark* was a nondelegable duty case, and it clearly is not. It is a products liability case, not a case about the vicarious liability of a principal for the negligence of an independent contractor. And again, even if there were a principal-independent contractor relationship between Ford and Maywood Bell (which there was not), *Vandermark* still could not be about holding a principal liable for an independent contractor's negligence, because Maywood Bell was not negligent.

It is true that a manufacturer's duty to produce a nondefective product is nondelegable in various respects. For example, if a third party supplier produces a defective component that a manufacturer incorporates into a larger product, thereby rendering the larger product defective, then the manufacturer cannot escape liability on the ground that the third party, rather than the manufacturer, caused the defect. (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 348, citing *Vandermark* ["Strict liability encompasses

10

all injuries caused by a defective product, even those traceable to a defective component part that was supplied by another"].)  Similarly, a manufacturer that produces a defective product cannot escape liability on the ground that downstream entities were supposed to inspect the product (as in *Vandermark*) or even on the ground that information about the defect was communicated to downstream entities by means of a recall notice (*Ford Motor Co. v. Robert J. Poeschl, Inc.* (1971) 21 Cal.App.3d 694, 698-699).  In all of those ways, the manufacturer's duty to produce a nondefective product is nondelegable.  Similar points would apply to the duty of a distributor.  But none of that has anything to do with vicarious liability or with holding an upstream party liable for the negligence of a downstream party.  Rather, it is about preventing the manufacturer (or distributor) from escaping liability for a product that was already defective when it left the manufacturer's (or distributor's) possession.

Thus, a manufacturer or distributor's nondelegable duty to produce or sell a nondefective product is fully discharged if the product is nondefective when it leaves the manufacturer's or distributor's possession.  There is simply no legal basis for the majority opinion's contrary conclusion.

The majority opinion attempts to bolster its misinterpretation of *Vandermark* by quoting out of context a single sentence from the Restatement Third of Torts, Products Liability (Restatement).  (Maj. opn., *ante*, at p. 20.)  The attempt fails, because the majority opinion misinterprets the Restatement as well.

11

According to the Restatement, "[o]ne engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." (Rest.3d Torts, Products Liability, § 1.) The Restatement further provides that "[a] product is defective when, *at the time of sale or distribution*, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings." (*Id.*, § 2, italics added.) A product "contains a manufacturing defect when the product departs from its intended design . . . ." (*Id.*, § 2(a).)

Taken together, those provisions mean that a manufacturer or distributor is liable for injuries caused by a defectively assembled product if the product was already defectively assembled when it left the manufacturer's or distributor's possession. The Restatement's comments make that clear: "Common examples of manufacturing defects are products that are physically flawed, damaged, or incorrectly assembled. In actions against the manufacturer, under prevailing rules concerning allocation of burdens of proof *the plaintiff ordinarily bears the burden of establishing that such a defect existed in the product when it left the hands of the manufacturer*." (Rest.3d Torts, Products Liability, § 2, com. c, italics added.)

The ensuing comments expand on the point: "Occasionally a defect may arise after manufacture, for example, during shipment or while in storage. Since the product, as sold to the consumer, has a defect that is a departure from the product unit's design specifications, a commercial seller or distributor *down the chain of distribution* is liable

12

as if the product were defectively manufactured. *As long as the plaintiff establishes that the product was defective when it left the hands of a given seller in the distributive chain*, liability will attach to that seller." (Rest.3d Torts, Products Liability, § 2, com. c, italics added.) That is, a departure from the product's design is classified as a "manufacturing defect" even if it arises after the product leaves the manufacturer's possession, but a seller ordinarily is liable for such a defect only if the defect already existed when the product left the seller's possession. Consequently, manufacturers are not, in general, liable for such defects.

The Restatement's rules and comments thus establish that if a product is not defective when it leaves the hands of a given seller, then the seller ordinarily will not be liable for a defect that arises later. If sellers were ordinarily liable for such defects, then the Restatement's repeated references to defects existing when the product leaves the seller's possession would be superfluous.

At the same time, it is not *impossible* for a seller to be liable for a defect that is created after the product leaves the seller's possession. In a particular case, there might be a basis to impose such liability. The Restatement's comments acknowledge that possibility too: "When the manufacturer delegates some aspect of manufacture, such as final assembly or inspection, to a subsequent seller, the manufacturer *may* be subject to liability *under rules of vicarious liability* for a defect that was introduced into the product after it left the hands of the manufacturer." (Rest.3d Torts, Products Liability, § 2, com. c, italics added.) That is, the manufacturer may or may not be liable, depending

13

upon whether there is an applicable rule of vicarious liability (such as respondeat superior).

The majority opinion asserts that its holding is "in accord" with the Restatement's comment concerning liability for a defect that is created after the product leaves the seller's hands. (Maj. opn., *ante*, at p. 20.) To a limited extent, that is true—the majority opinion holds Yamaha liable for a defect that was created after the motorcycle left Yamaha's possession, and the Restatement does not state that such liability is categorically impossible. But in every other way, the majority opinion conflicts with the Restatement. According to the majority opinion, a distributor like Yamaha is always liable for a defect introduced by a downstream seller like Langston, with no need for further analysis. (See, e.g., maj. opn., *ante*, at p. 2 ["if the dealer negligently assembled the product, Yamaha was jointly liable for damages caused by that negligence"].) The Restatement, in contrast, says only that an upstream party *may* be liable for a defect introduced by a downstream party, depending upon whether there is an applicable rule of vicarious liability. The majority opinion does not identify any such rule. And according to the majority opinion, the distinction between defects existing before the product leaves the seller's possession and defects created later is of no significance—the seller's nondelegable duty automatically renders the seller liable for all of them. But according to the Restatement, the timing is pivotal—the seller *is* liable for defects that existed when the product left the seller's possession, but the seller merely *may be* liable for later-created defects, if there is an applicable principle of vicarious liability.

14

In all of these ways, the Restatement provides no support for the majority opinion and actually conflicts with it. As the Restatement confirms, there is no basis in products liability law to hold Yamaha liable for Langston's negligent assembly of the motorcycle. And the majority opinion does not identify any rule of vicarious liability that would make Yamaha liable, so, according to the Restatement, Yamaha is not liable.

Finally, the majority opinion's interpretation of *Vandermark* is completely ahistorical. Before the dramatic developments in California products liability law in the 1960s, in general the manufacturer of a product that injured a consumer was not liable without privity of contract. That is, a manufacturer generally was not liable *even for its own negligence* unless there was contractual privity between the manufacturer and the injured party. (See generally Cotchett & Cartwright, Cal. Products Liability Actions (2022) § 1.01 (Cotchett & Cartwright).) The California Supreme Court abolished the privity requirement in *Greenman*, holding that "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman*, *supra*, 59 Cal.2d at p. 62.)

*Greenman* was decided in 1963. Its major innovation was the imposition of strict tort liability on a manufacturer in the absence of contractual privity with the injured purchaser. (Cotchett & Cartwright, *supra*, § 1.03.) *Vandermark* was decided in 1964. Its major innovations were the imposition of strict tort liability on a retailer for selling a defective product and the extension of such liability to injured parties other than the

15

actual purchaser (one of the plaintiffs was a passenger with no ownership interest in the car). (Cotchett & Cartwright, at § 1.03.)

If the majority opinion were right that *Vandermark* held that a manufacturer is liable for a dealer's negligence, then that holding would have been a bombshell. Just one year after revolutionizing products liability law by holding manufacturers liable *for their own negligence* without contractual privity, the Supreme Court would, on the majority opinion's interpretation, have held manufacturers strictly liable for the negligence of retailers who were not the manufacturers' employees or even their independent contractors. Reactions to that holding—both positive and negative—would have been swift, shrill, and numerous, and case after case would have cited *Vandermark* for the remarkable proposition that selling a nondefective product can be a tort. But there was no such reaction, and no published California appellate decision before today has cited *Vandermark* for the proposition that a manufacturer or distributor who sells a nondefective product is vicariously liable for a retailer's negligence.

The majority opinion claims that *Vandermark*'s alleged holding—that a manufacturer is liable for a dealer's negligence—actually was recognized as a bombshell in Prosser, *The Fall of the Citadel* (*Strict Liability to the Consumer*) (1966) 50 Minn. L.Rev. 791 (Prosser). (Maj. opn., *ante*, at pp. 20-21, fn. 5.) The majority opinion also cites Leebron, *An Introduction to Products Liability: Origins, Issues, and Trends* (1990) Ann.Surv.Amer.L. 395 (Leebron) in support of its interpretation. (Maj. opn., *ante*, at

16

p. 21, fn. 5.) The majority opinion is again mistaken, because Prosser's and Leebron's interpretations of *Vandermark* are the same as mine.

Prosser cites *Vandermark* for the proposition that "the maker of an automobile with a defective steering gear, or a leak in the hydraulic brake line, can scarcely expect to be relieved of his responsibility by reason of the fact that the car is sold to a dealer who is expected to service it, adjust the brakes, mount the tires, and the like, before it is ready for use." (Prosser, *supra*, 50 Minn. L.Rev. at pp. 806-807 & fn. 90.) Prosser thus understands *Vandermark* as rejecting the manufacturer's attempt to evade liability for its own defective product, not as holding the manufacturer liable for the dealer's negligence.

Similarly, Leebron cites *Vandermark* for the proposition that "courts early on rejected attempts by automobile manufacturers to avoid strict liability by delegating final tasks, such as inspection of the brakes, to dealers." (Leebron, *supra*, Ann.Surv.Amer.L. 395 at p. 424.) That is, the dealer's duty to inspect the brakes does not cut off the manufacturer's liability for having produced a car with defective brakes. Again, none of that has anything to do with holding a manufacturer liable for a dealer's negligence.

Prosser characterized *Vandermark* as "extreme" not because it held a manufacturer liable for a dealer's (nonexistent) negligence but because it took such an extreme position concerning the conduct of intermediaries between the defective product's manufacturer and the injured plaintiff. (Prosser, *supra*, 50 Minn. L.Rev. at pp. 826-828.) The relevant passage occurs in a section of the article entitled "Intervening Conduct," which discusses the circumstances in which the seller of a defective product might escape liability

17

because of the conduct of a third party who intervenes between the seller and the injured plaintiff. (*Id.* at pp. 826-828.) The article explains, for example, that "the failure of the dealer, or some other intermediate party, *to discover the defect* on the product, or any other negligent conduct on his part, or indeed on the part of anyone else, which is found reasonably to be anticipated, will not relieve the earlier supplier of liability." (*Id.* at pp. 826-827, fns. omitted, italics added.) Thus, if the product was already defective when it left the earlier seller's possession, then the dealer's failure to discover the defect will not relieve the earlier seller of liability.

But the article goes on to distinguish situations in which intervening conduct might cut off the manufacturer's liability, such as "where the intermediate party is notified of the danger, or discovers it for himself, and proceeds de[li]berately to ignore it and to pass on the product without a warning." (Prosser, *supra*, 50 Minn. L.Rev. at p. 827, fns. omitted.) The discussion then turns to *Vandermark*, which is "the most extreme decision" in this area because it states that the dealer's intervention does not cut off the manufacturer's liability no matter what the dealer "'did or failed to do.'" (*Id*. at pp. 827-828.) The article concludes by observing that it is not yet clear how *Vandermark* will be interpreted and applied, such as "whether the decision would be the same if the dealer *discovered the danger* and sold the car deliberately *with no attempt to remedy it*." (*Id.* at p. 828, italics added.) That is, it "is not yet determined" whether the manufacturer would be liable if (1) the car was already defective when it left the manufacturer, and (2) the dealer discovered the defect but sold the car without even trying to fix it. (*Ibid.*) Yet

18

again, none of that has anything to do with holding a manufacturer liable for a dealer's negligence. It is about holding a manufacturer liable for a product that was defective when it left the manufacturer's possession, and not letting the manufacturer escape liability on the basis of a subsequent act or omission by a downstream seller.

The majority opinion's reliance on Prosser is therefore misplaced. Prosser interprets *Vandermark* the same way I do. And Prosser did not describe the majority opinion's rule—that a manufacturer is liable for a dealer's negligence—as extreme or a bombshell, because Prosser did not find any such rule in *Vandermark*.

There is one additional oddity about the majority opinion that is worth noting. The majority opinion purports to apply an uncontroversial, well-settled theory of tort liability that has existed at least since the Supreme Court decided *Vandermark* in 1964. But there is no pattern jury instruction on the majority opinion's theory. CACI contains extensive instructions on theories of products liability, negligence, and vicarious liability (see CACI Nos. 400-473, 1200-1249, 3700-3727), but the majority opinion's theory is not among them. If such a useful and well-established rule of tort liability really existed, then it would be hard to understand why in the last 58 years no one ever saw the need to draft a pattern instruction to explain it to a jury.

For all of the foregoing reasons, I disagree with the majority opinion's holding that when a distributor sells a nondefective but partially unassembled product to a dealer and the dealer negligently assembles it, thereby rendering it dangerous, the distributor is

19

vicariously liable for the dealer's negligence.  That holding is erroneous, and neither *Vandermark* nor any other California authority supports it.

3.    *A Distributor-Dealer Relationship Is Not a Principal-Independent Contractor Relationship, so CACI No. 3713 Does Not Apply*

The majority opinion's partial reversal of the judgment is based on instructional error.  (Maj. opn., *ante*, at pp. 7, 20.)  The putative error was the trial court's rejection of Defries's request to instruct the jury with CACI No. 3713.  The trial court's ruling was correct, because CACI No. 3713 does not apply to this case.

The bench notes for CACI No. 3713 explain that the instruction is to be used "with regard to the liability of the hirer for the torts of an independent contractor if a nondelegable duty is imposed on the hirer by statute, regulation, ordinance, contract, or common law."  "An independent contractor is a person who contracts with another to do something for [them] but who is not controlled by the other nor subject to the other's right to control with respect to [the independent contractor's] physical conduct in the performance of the undertaking."  (Rest.2d Agency, § 2, subd. (3).)

Defries does not argue that Langston contracted with Yamaha to assemble the motorcycle that was eventually purchased by Defries's wife.  Langston bought the partially unassembled motorcycle from Yamaha.  As to that motorcycle, Langston and Yamaha's contractual obligations to each other were satisfied once Langston paid Yamaha and Yamaha delivered the motorcycle to Langston.  Because Yamaha did not hire Langston to assemble the motorcycle (or to do anything else, as far as the evidence

20

shows), Langston was not Yamaha's independent contractor. CACI No. 3713 therefore does not apply, and the trial court correctly rejected Defries's request for it.

The terms of CACI No. 3713 confirm that there is no way to apply it in this case. The instruction provides that the plaintiff must prove "[t]hat [*name of defendant*] hired [*name of independent contractor*] to [*describe job involving nondelegable duty, e.g., repair the roof*]." Because Yamaha did not hire Langston to do anything, it is impossible to complete the third bracketed portion of the instruction. Neither Defries nor the majority opinion has explained how it is to be done. The majority opinion concedes that certain bracketed portions in CACI No. 3713 "might have been difficult to fill in" (maj. opn., *ante*, at p. 20) but does not mention this one. The upshot is that the judgment is being reversed for failure to give a particular jury instruction, but no one knows what the instruction is supposed to say.

For the foregoing reasons, the trial court did not err by declining to instruct the jury with CACI No. 3713. Yamaha did not hire Langston to do anything, Langston is not Yamaha's independent contractor, and CACI No. 3713 consequently has nothing to do with this case.

4.    *Conclusion*

The majority opinion creates a sweeping new rule of tort liability that has no basis in California law. The majority opinion purports to find that rule in *Vandermark*, where it has escaped the notice of every lawyer and judge in California for the last 58 years. And the damage that the majority opinion thereby does to California law is wholly

21

gratuitous, because even if the majority opinion were right about *Vandermark*, we should not reach the issue, because the only requested instruction on it, CACI No. 3713, is clearly inapplicable.

The trial court's judgment should therefore be affirmed in its entirety. Accordingly, I respectfully dissent from the portions of the majority opinion and judgment that partially reverse, and I otherwise concur.

MENETREZ
J.